FILED

2005 Jan-19  AM 09:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEAST DIVISION

TERRY CALLOWAY                    )

     PLAINTIFF,                    )

VS.                              )          CV-02-HS-1305-NE

PPG INDUSTRIES, INC.             )

     DEFENDANT.                    )

### MEMORANDUM OF DECISION

The court has before it defendant's February 5, 2004 motion for summary judgment.  Pursuant to the February 5, 2004 order, and the filing of documents described therein, the motion for summary judgment came under submission on March 8, 2004 without oral argument.

### I.   PROCEDURAL HISTORY

Plaintiff Terry Calloway ("Calloway") commenced this action[1] on May 28, 2002 seeking damages for injuries sustained after falling at defendant's, PPG Industries, Inc. ("PPG"), plant on June 28, 2000.  Defendant filed its answer on June 17, 2002.[2]

---

[1]  On December 23,2002, the Alabama Self-Insured Worker's Compensation Fund filed a intervenor complaint [Doc. # 23-1].  The Alabama Self-Insured Worker's Compensation Fund was the worker's compensation carrier for Delta Industrial Services, the plaintiff's employer, at the time the plaintiff was injured.  The Fund's claims relate to payments made to the plaintiff for the injuries alleged in this lawsuit.

[2]  On December 5, 2002, the defendant moved the court for leave to file a third party complaint against plaintiff's employer, Delta Industrial Services, Inc.  That motion was denied

On February 5, 2004, defendant filed its motion for summary judgment [Doc. # 29-1] accompanied by a comprehensive brief in support of the motion [Doc. # 31-1].  The brief included a numbered set of undisputed facts referencing evidence[3] submitted by defendant to support its motion.  On February 26, 2004, plaintiff filed a response [Doc. # 33-1] to defendant's motion, which _inter alia_, admitted or objected to the numbered fact paragraphs offered by the defendant as undisputed.  Plaintiff also submitted evidence[4] in opposition to defendant's motion for summary judgment. Moreover, plaintiff introduced thirty-nine additional undisputed fact paragraphs which were individually admitted or objected to by defendant in its reply brief [Doc. # 35-1] filed on March 8, 2004.

Defendant has also moved the court to exclude or strike the report and opinions of plaintiff's safety expert John Chester Frost

---

on December 6, 2002 because no good cause was shown to excuse its untimeliness.

[3]  Defendant submitted: plaintiff's complaint; the deposition of the plaintiff; the deposition of Ben Miller with attached exhibits; excerpts from the deposition of Ray Piscorz; excerpts from the deposition of Bill Bajoras; PPG Purchase Order; General Terms and Conditions of PPG Purchase Order; Agreement to the rider for contract and services; Rider to contract and services; Glass Operations Contractor Safety Implementation Guidelines; Signed acknowledgment of plaintiff; Signed acknowledgment of Ray Piscorz.

[4]  Plaintiff submitted: affidavit of plaintiff, the deposition of Bill Bajoras with attached exhibits; excerpts from the deposition of Terry Calloway; excerpts from the deposition of Ben Miller; excerpts from the deposition of Ray Piscorz; and excerpts from the deposition of John Frost with attached exhibits.

[Doc. # 36-1] used to support plaintiff's opposition to summary judgment.  Although plaintiff did not file anything in opposition of the motion, the merits and implications of the motion are addressed herein.

### II. Standards for Evaluating a Summary Judgment Motion

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); Chapman, 229 F.3d at 1023. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. See Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in

either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. See

<u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders</u> <u>of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III.   Relevant Undisputed Facts[5]

PPG has a plant in Huntsville, Alabama that produces plate glass products including aircraft windshields.  PPG utilizes the services of Delta Industrial Services ("Delta"), as well as other similar contractors, to complete a variety of jobs inside the plant.  (<u>See</u> Piscorz Depo. at 71-72.)  Over the past seventeen years, Delta has had approximately 100-200 workers at the PPG plant, and at times, Delta employees were working at the plant on a daily basis.  (<u>See</u> <u>id.</u>)

*1.   Plaintiff and the PPG Facility*

Delta is actively run and partially owned by Ray Piscorz. (<u>See</u> <u>id.</u> at 13-14.)  Ben Miller is a Delta employee who supervised the installation of a chilled water line at the PPG facility.  (<u>See</u> <u>id</u>. at 29; Compl. at ¶ 5.)  Plaintiff was also employed by Delta and was working with Miller on the chilled water line when he was injured.  (<u>See</u> Compl. at ¶ 5.)  Although plaintiff did not have a formal job title, he was hired to assist in a variety of tasks including demolition, painting and pipe work.  (<u>See</u> Calloway Depo. at 40.)  Delta paid plaintiff $10.00 per hour, before taxes, with no benefits.  (<u>See</u> <u>id.</u> at 28.)

---

[5]  If the facts are in dispute, they are stated in the manner most favorable to plaintiff, as the non-moving party.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115.

Plaintiff's first day working at the PPG plant was April 18, 2002. (See Def.'s Ex. 11.)  On this day, he parked his vehicle at the PPG lot, signed in at the PPG guard room, watched a safety video, was issued safety glasses, and went to work. (See Calloway Depo at 42-43.)  During this in-processing, plaintiff signed a document indicating that he received a safety booklet.[6]  (See id. at 42-45.)  The document stated "PPG Industries, Inc. has provided and reviewed with me the contents of the booklet 'Contractor Safety Implementation Guidelines' for purposes of briefing employees under my supervision." (See Def. Ex. 11.)

PPG has procedures regarding fall protection that apply to its employees and maintenance personnel.  (See Bajoras Depo. at 10-13.) All contractors are required to comply with the Occupational Safety and Health Act ("OSHA").   (See Def.'s Ex. 8.)   In the event employees of contractors fail to comply with safety requirements, PPG reports the noncompliance to the contractor and has the right to remove the contractor.  (See Bajoras Depo. at 13-15.)  Delta was responsible for all safety issues regarding its employees.  (See Piscorz Depo. at 29, 54.)  As such, Delta did not expect PPG to provide Delta's employees with fall protection gear.  (See id. at 52-53.)  The fall protection gear, consisting of a full body harness, was required when a worker could potentially fall six or

---

[6]  The book and video do not specifically state that one must wear a full body safety harness when working at heights exceeding six feet.  (See Bajoras Depo. at 23.)

more feet.  (See Bajoras Depo. at 12-13.)  This is consistent with OSHA regulations.  (See id. at 24.)

*2.   Chilled Water Line Project*

Miller and plaintiff were assigned to install a chilled water line at the PPG facility.  (See Calloway Depo. at 58-60.)  More specifically, the water line was to be located in a mid-ceiling area above the clean room.  (See id.)  This area was not in general view of workers on the ground.  (See Bajoras Depo. at 47; Piscorz Depo. at 68-69.)  Miller and plaintiff laid out pipe for about three or four hours that day.  (See Calloway Depo. at 76.)  They did not complete the installation at this time and went to work on a different project.  (See id. at 59-60.)

On June 28, 2000, about one week after laying the pipe, plaintiff and Miller left the different project and returned to the mid-ceiling area to finish the chilled water line.  (See id. at 60, 77.)  Miller never told PPG that he and plaintiff were stopping work on the different project in order to finish the chilled water line.  (See Miller Depo. at 38-39.)  PPG employees were not present in the mid-ceiling area while plaintiff was working.  (See Calloway Depo. at 59.)  Upon returning to the mid-ceiling area, Miller sat on some air conditioning duct work to drill a hole in the roof. (See id. at 67-69.)  Miller drilled without wearing any safety

equipment.[7]   (See id. at 68-69.)   After drilling, Miller went on top of the building's roof so that plaintiff could feed pipe up through the drilled hole to him.   (See id. at 79-80.)

In order to make the connection with Miller, plaintiff had to position himself above a dropped ceiling.   (See id. at 81.)   First he crawled across some silver duct work to get near the dropped ceiling.   (See id. at 92.)   At this point, he was about fifteen feet above the floor below and not wearing fall protection.[8]   (See id. at 94-95.)   Since the area over the dropped ceiling did not have a solid floor, but rather a series of metal beams, plaintiff needed something to stand on.   (See id. at 81, 86.)   Miller had positioned a 2" by 6" by 10' board over the dropped ceiling for this purpose.   (See id. at 86, 93.)

---

[7]   PPG had specifically told Miller to wear fall protection gear in the past.   (See Miller Depo. at 45.)

Plaintiff noted that if Miller had fallen off the duct work while drilling, he would have fallen through the dropped ceiling of the clean room approximately fifteen feet.   (See Calloway Depo. at 78-80.)

[8]   Plaintiff "didn't realize [that falling fifteen feet off the board] could have been that serious."   (See Calloway Depo. at 94.)   There is no question that the plaintiff should have been wearing his fall protection gear at the time of the incident.  (See Piscorz Depo. at 31, 44-46.)   Miller had brought Delta's fall protection gear to PPG for this particular job.   (See id.)  Moreover, Miller knew that the dropped ceiling would not support the weight of a man, yet he did not think about wearing a safety harness which was available in a nearby "gang box" while he and plaintiff were working.  (See Miller Depo. at 28-29, 62.)

Plaintiff could not see the board from the duct work because it was dark, so he had to locate the board by touch.[9]  (See id. at 97.)  After finding the board, plaintiff eased off the duct work by sliding his "rump" down about three feet to the board.  (See id. at 104.)  Plaintiff stood up on the board, and within sixty seconds, turned to his left to reach for pipe grease.  (See id. at 88, 104-05.)  As he turned and unsuccessfully reached for the grease, the board he was standing on shifted with him and, when plaintiff tried to correct himself, he stepped off the board with his left foot.  (See id. at 81.)  Plaintiff fell through the ceiling onto the floor below.  (See id. at 107-08.)  He forcefully landed on his feet and rolled onto his right side.  (See id.)  A man working on the floor below immediately sounded a bell indicating that an accident had occurred, which promptly summoned medical professionals to plaintiff's aid.  (See id.)  Plaintiff sustained serious injury. (See Calloway Aff. at 2.)

## IV. Applicable Substantive Law and Analysis

---

[9]  Plaintiff did not have a flashlight and did not ask for any additional lighting.  (See Calloway Depo. at 97.)  The plaintiff noted that because the area where he fell was "dark ... probably [not] pitch black dark but it was dark," he probably could not have been seen from the ground below.  (See id. at 106-07.)

In addition, plaintiff did not check to see if the board was lying flat before getting on the board and he did not ask Miller if there was an alternative way to do the job.  (See id. at 88-90.)

Plaintiff's complaint alleges the following claims premised on negligence and wantonness: (1) failure to provide a safe place to work; (2) failure to inform plaintiff of dangers in the workplace; and (3) failure to supervise and provide protective equipment and/or procedures. (See Compl. at ¶ 6, 7.) Defendant's motion for summary judgment generally asserts that no genuine issue of material fact exists and that defendant is entitled to judgment as a matter of law. (See Def.'s Mot. Summ. J.) Defendant specifically avers that plaintiff cannot prove negligence or wanton misconduct because, under the undisputed facts, Alabama law did not impose on PPG, as the owner of the property, a duty to plaintiff, as the employee of Delta, an independent contractor, working on the property for PPG. (See id.) Defendant requests that the court enter an order dismissing plaintiff's claims with prejudice. (See id.)

1.  *Legal Relationship Between the Owner and the Injured Worker's Employer*

Defendant's liability to plaintiff is largely predicated upon its contractual relationship with Delta, plaintiff's employer. If Delta is an independent contractor of PPG, then PPG will not be liable for plaintiff's injuries unless it was caused by the owner's breach of one of the duties to workers imposed by law. See Dixie State Lines v. Anderson, 134 So. 23, 23 (Ala. 1931) (stating the general independent contractor rule). Moreover, if Delta was an independent contractor, as opposed to an "employee" of PPG, then

11

defendant will also be protected by the general rule of nonliability for injuries to contractor's workers. (See infra.)

While there is not a precise mechanical formulation to determine whether a contractor is an employee or independent contractor, the "true test" is whether the premises owner reserved "the right to control ... rather than the actual exercise of control." Wheeler v. Wright, 668 So. 2d 779, 781 (Ala. Civ. App. 1995) (internal citation omitted); see also Alabama Power Co. v. Beam, 472 So. 2d 619, 625 (Ala. 1985) (stating that for an agency relationship to be formed there must be a retention of control over the manner in which the work is done). Many factors are relevant to evaluating control, but plaintiff directs the court to the four factors noted by the Wheeler court: (1) evidence of a right or exercise of control, (2) method of payment, (3) whether equipment is provided, and (4) who has the right of termination. 668 So. 2d at 781 (these control factors are a guideline even though Wheeler is not factually exact to the case sub judice).

PPG's Purchase Order dated June 20, 2000 stated that PPG would pay Delta $50,475.00 for two projects including:

> Item (1): Supply *all labor, supervision, materials, equipment and tools* to fully install 4-inch chilled water lines ...

(See Def.'s Ex. 6.)  The general conditions attached to this Purchase Order provided additional terms:

> 7.   INSPECTION.  Buyer reserves the right to inspect and expedite the materials, and their fabrication,

at the facilicites of Seller or its suppliers. Inspection by Buyer does not relieve Seller of any warranties or obligations hereunder.

14. CANCELLATION.  Buyer reserves the right to cancel this Purchase Order, or any part thereof, at any time, without cause, by written notice to Seller.

Furthermore, the rider to the agreement, signed by Delta's owner, Ray Piscorz, on June 20, 2000, further defined the relationships and expectations with respect to the Purchase Order:

A.   Independent Contractor:

The status of the Contractor shall be that of an *Independent Contractor*.  Nothing in this Rider, the Purchase Order or any other contractual Document shall be construed as being inconsistent with that status.  Contractor shall pay the contributions measured by the wages of its employees required to be made under [law], applicable to services being performed hereunder. Contractor shall accept exclusive liability for said contributions and shall indemnify and hold PPG harmless from any and all liability arising therefrom.

E.   Safety

(b)   In all cases Contractor's work and services, including but not limited to all construction equipment used therefor, shall be in compliance and performed in accordance with the Federal Occupational Safety and Health Act and the Construction Safety Act, including all amendments and supplements thereto, as well as all other [laws].

G.   Payment Retention:

PPG may, at its option, retain 10% of each invoice amount until final acceptance of the work has been executed.

(See Def.'s Ex. 8.)  In addition to the documents defining their

13

relationship, PPG's "Contractor Safety Implementation Guidelines" stated:

> Contractor's Tools and Equipment
>
> A.   Contractors will furnish *all* tools and equipment.
>
> Q.   Adequate fall protection shall be *provided by the contractor* when the hazard of a fall exists as defined in the OSHA standards.

(Emphasis supplied.)

(See Def.'s Ex. 10.)

As will be discussed hereinafter, the court is satisfied that plaintiff has failed to produce evidence from which a reasonable jury could conclude that defendant reserved a right to control Delta.  The relevant contract provisions are similar to provisions found throughout the plethora of Alabama cases evaluating the issue of control of independent contractors and finding that no such control existed.  The Purchase Order gave Delta all control over how the work was completed and, as such, Delta is properly characterized as an independent contractor.

*2.   Duty to the Plaintiff as to the Event Causing Injury*

Under Alabama law, negligence is the failure to do that which a reasonably prudent person would have done under the same or similar circumstances.  See Sanders v. Scarvey, 224 So. 2d 247, 250 (Ala. 1996).  In order for the plaintiff to prevail on the negligence claims, the plaintiff traditionally must try not to separate  prove four elements: (1) a duty owed to a foreseeable

plaintiff, (2) a breach of that duty, (3) causation, and (4) damages. See <u>AALAR, Ltd., Inc. v. Francis</u>, 716 So. 2d 1141, 1144 (Ala. 1998); <u>Sammons v. Garner</u>, 222 So. 2d 717, 718 (Ala. 1969). Likewise, duty is an important consideration for wanton misconduct.[10] <u>See</u> <u>Ward v. Southern Pine Elec. Co-op., Inc.,</u> 401 So. 2d 22, 24 (Ala. 1981) (citation omitted); <u>Whaley v. Lawing</u>, 352 So. 2d 1090 (Ala. 1977) (defining wanton misconduct as "the conscious doing of some act or the omission of some *duty* (while) under knowledge of existing conditions and while conscious that, from the doing of such act or the omission of such duty, injury will likely or probably result."); <u>see</u> <u>also</u> <u>Kendrick v. Alabama Power Co.,</u> 601 So.2d 912, 914 (Ala. 1992) ("in order to prove negligence or wantonness, [plaintiff] must prove that [the premises owner] owed him a duty ...."). Therefore, the threshold inquiry in this case is

---

[10] While negligence is a qualitatively different tort than wantonness, duty is critical to plaintiff's claim for wantonness because plaintiff alleges that defendant omitted to perform certain acts. The court will look for evidence indicating whether defendant was "conscious[ ] that the doing or not doing of some act would likely result in injury...." <u>Rommell v. Auto. Racing Club of Am.,</u> 964 F.2d 1090, 1096 (11th Cir. 1992).

whether a duty existed.[11]   The court will address each of plaintiff's grounds for liability separately below.

a.   *Failure to Provide a Safe Workplace*

The first issue is whether defendant owed plaintiff a legal duty to provide a safe working environment.   In arguing for and

---

[11]   Defendant has moved the court to exclude or strike plaintiff's expert's testimony because "the plaintiff's expert relies on the 'multi-employer' doctrine of OSHA in order to trigger an alleged duty owed by PPG to the plaintiff."   (See Def.'s Mot. Excl. or Str., at ¶ 2.) ("[t]he multi-employer doctrine provides that an employer who controls or creates a worksite safety hazard may be liable under [OSHA] even if the employees threatened by the hazard are solely employees of another employer." Universal Constr. Co., Inc. v. Occupational Safety and Health Review Comm'n, 182 F.3d 726, 728 (10th Cir. 1999).)   While the Eleventh Circuit is not among the appellate courts expressly adopting the "multi-employer" doctrine (stemming from 29 U.S.C. § 654(a)(2)), in the circuits that have, it is inapplicable to property owners.   Jordan v. Nucor Corp., 295 F.3d 828, 837 (8th Cir. 2002).   Instead, the doctrine applies only to general contractors when they could have been reasonably expected to prevent a safety violation because of their supervisory capacity.   Jordan, 295 F.3d at 837; see also Sec. of Labor v. Olson Constr. Co., 1977 WL 7755, at *3 (O.S.H.R.C. 1977).

Plaintiff's reason for including the expert's deposition in his opposition brief is not entirely clear because it is not accompanied by any explanation or argument, however, it was likely to invoke a duty under the "multi-employer" doctrine because the testimony is offered under a heading entitled "OSHA Violations According to Plaintiff's Expert."   PPG was not acting as a general contractor, and hence, the doctrine is inapplicable. Applying the general rule that in a negligence action, the rules promulgated under 29 U.S.C. §§ 651 et seq. do not establish a duty of care owed to third persons, Barrera v. E.I. DuPont De Nemours & Co., Inc., 653 F.2d 915, 920 (Former 5th Cir. 1981), the court finds that it is inappropriate to further inquire into whether the defendant owed plaintiff an affirmative duty by operation of OSHA.   See Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981).   For these reasons, and to this extent, defendant's motion to exclude [Doc. # 36-1] will be granted by separate order.

against summary judgment, both parties have focused on the line of Alabama cases regarding "working conditions arising during the progress of the work on the contract." See Weeks v. Alabama Elec. Co-Op., Inc., 419 So. 2d 1381 (Ala. 1982) (setting forth the controlling premises liability law). The general rule under Weeks and its progeny is that "a premises owner owes *no duty* to an employee of an independent contractor with respect to work conditions arising during the progress of work on the contract" See Ramirez v. Alabama Power Co., 898 F.Supp. 1537, 1542 (M.D. Ala. 1995), aff'd 86 F.3d 117 (11th Cir. 1996); Kendrick, 601 So.2d at 914; Weeks, 419 So. 2d at 1383. Based on the evidence submitted to this court, Delta was an independent contractor of PPG and plaintiff was Delta's employee actively pursing contract work when he was injured. Thus, at first blush, the general rule squarely indicates that defendant did not owe plaintiff a duty to provide safe working conditions. While plaintiff does not concede this point, he argues that the general rule is inapplicable under these facts and also attempts to invoke one of several exceptions.

The general rule does not apply "when a premises owner retains or reserves the right to control the manner in which the independent contractor performs its work." Weeks, 419 So. 2d at 1383 (citing Thompson v. City of Bayou La Batre, 399 So. 2d 292, 294 (Ala. 1981) and Hughes v. Hughes, 367 So. 2d 1384, 1386 (Ala. 1979)). This is because control forms a master-servant

17

relationship. Id. However, "a master-servant relationship is *not* created ... when the owner merely retains the right to inspect or supervise the work of an independent contractor as it progresses for the purpose of determining whether [the work] is completed according to plans and specifications and retains the right to stop work that is not properly done." Id. (citing Pate v. United States Steel Corp., 393 So. 2d 992, 995 (Ala. 1981)); see also Ramirez, 898 F.Supp. at 1542.

Control is the sine qua non of both parties' arguments. Two areas of evidence are relevant to evaluate the premises owner's control: (1) the terms of the contract between the parties and (2) the conduct of the premises owner. Ramirez, 898 F. Supp. at 1542 (citing Pugh v. Butler Tel. Co., 512 So. 2d 1317 (Ala. 1987)). "Hence, to overcome summary judgment, the plaintiff must raise genuine issues of material fact by offering 'any evidence tending to establish that [PPG] retained this control either by contract or by its actions....'" Id. (quoting Weeks, 419 So. 2d at 1383).

As is discussed above in detail, the terms of the agreements do not reserve control over Delta or Delta's employees. (See supra.) However, plaintiff advances several arguments regarding instances where PPG allegedly evinced control through conduct.[12] First, plaintiff argues that PPG's long standing relationship with

---

[12]  The court does its best to discern plaintiff's arguments because this portion of plaintiff's brief is a collection of facts without explanation.

Delta is an indicia of control. It is undisputed that Delta completed more than 100 jobs for PPG over a seventeen year period. (See Piscorz Depo. at 71.) At times, Delta employees frequently worked at the PPG facility. (See Bajoras Depo. at 35-38.) Delta was hired on a project-to-project basis as is the regular practice for independent contractors. Although past dealings can be relevant, the court does not see how these facts indicate control. A premises owner hiring an independent contractor for an infinite number of jobs does not change the fact that it is still an independent contractor. Any other rationale would prevent owners from hiring the same independent contractor more than a few times for fear of assuming vicarious liability.

Moreover, plaintiff argues that the video and safety manual shown during in-processing is an example of control. Plaintiff is correct that offering "safety tips" is a pertinent fact regarding control. See Ramirez, 898 F.Supp. at 1543. However, there are a number of other considerations playing into the analysis. See Id. ("[the premises owner] did not instruct [the independent contractor's] employees on how to paint, did not supervise the work, did not offer any safety tips and did not provide any of the equipment and tools used.") (brackets supplied); Thomas v. Pepper S. Constr. Co., 585 So. 2d 882, 884 (Ala. 1991) ("'right to enforce a safety [rule] if a violation is observed does not, alone,

constitute a voluntary assumption of the duty to inspect for safety.'") (internal citation omitted).

Again, defendant did not exercise influence over the chilled water line project. Upon entering the facility, the Delta workers had to sign in, meaning PPG employees knew the Delta workers were on site. However, many different contractors were working at the facility and there were approximately 600 employees at the plant on the day plaintiff was injured. Neither Miller nor plaintiff told PPG that they were returning to work on the chilled water line and PPG did not have a presence in the mid-ceiling area during the pipe installation. Thus, PPG did not know exactly what Miller and plaintiff were doing within the large operation.

Plaintiff also mentions that PPG employees regularly conversed with Delta employees as to various topics, including their whereabouts. On one occasion, a PPG employee ordered plaintiff to wear his safety goggles. Nevertheless, keeping tabs on independent contractors in one's facility and having the right to enforce a safety violation does not create a duty. See Thomas, 585 So. 2d at 884. The Alabama Supreme Court addressed a similar contention in Thomas where the premises owner held frequent meetings with workers to remind them of the $50 fine for not wearing hard hats or required shoes. Id. at 885. The court held that the meetings did not show enough control to create a jury question. Id. Although PPG offered safety tips and required contractors to comply with

OSHA, the court views this as no more than a premises owner taking reasonable precautions to maintain order in its facility.

The absence of control is further evidenced by the facts surrounding the water line installation.  Ben Miller, a Delta employee, was guiding plaintiff step-by-step on how to complete the water line job.  Miller even told plaintiff to stand on the board he ultimately fell off.  PPG wanted a chilled water line, so they hired Delta.  Delta sent the materials, equipment, and employees to do the work.  This working arrangement is indicative of a classic owner/independent contractor relationship where the owner adds the caveat that the job must be done safely. Considering the evidence in the light most favorable to plaintiff, no duty was owed by virtue of control.

Plaintiff's second argument is that the pipe installation job was intrinsically dangerous,[13] thereby invoking an exception to the general no duty rule.  Although one is not usually responsible for negligent acts of his independent contractor, when one employs an independent contractor to perform inherently dangerous work, the owner is subject to liability for injury caused to others by the contractor's failure to take reasonable precautions.  <u>Clark v. Container Corp. of Am.</u>, 936 F.2d 1220, 1224-25 (11th Cir. 1991)

---

[13]  As the <u>Ramirez</u> court noted, "the inherently dangerous activity and non-delegable duty exceptions are interconnected in that Alabama courts hold in some instances, the duty to provide a safe workplace when an inherently dangerous activity is involved is non-delegable." 898 F.Supp at 1543 n.4.

(citing <u>Jones v. Power Cleaning Contractors</u>, 551 So. 2d 996, 998
(Ala. 1989); <u>Boroughs v. Joiner</u>, 337 So. 2d 340, 342 (Ala. 1976)).


Defendant responds that this claim fails as a matter of law
because although the task was not inherently dangerous, "no matter
how dangerous the plaintiff alleges his work is, he must also show
that PPG retained or exercised control over his work." (<u>See</u> Def.'s
Mot. Sum. J.)  Defendant explains that the law makes an exception
to the non-delegation rule derived from ALA. CODE. § 25-1-1 (1975)
(requiring *employers* to provide a safe workplace).  Defendant cites
an excerpt from <u>Ramirez</u>, quoting <u>Procter & Gamble Co.</u> to support
this proposition:

> [W]hen an outside party is in 'control or custody' of the
> worker's employment ... cases have arisen either where a
> subcontractor's injured employee has sought to charge the
> general contractor with the duty to provide a safe
> workplace, or where a general contractor's injured
> employee has sought to charge the premises owner with
> that duty.  In those cases, we have required that the
> plaintiff prove that the defendant exercised control over
> the job site and control over the manner in which the
> work was to be done, *and* prove either that the work was
> intrinsically dangerous or that the defendant had
> undertaken to provide safety on the jobsite.  <u>See</u>, <u>e.g.</u>,
> <u>Alabama Power Co. v. Jarman</u>, 549 So. 2d 7 (Ala. 1989);
> <u>Alabama Power Co. v. Beam</u>, 472 So. 2d 619 (Ala. 1985);
> <u>Alabama Power Co. v. Henderson</u>, 342 So. 2d 323 (Ala.
> 1976); <u>Blount Bros. Constr. Co. v. Rose</u>, 149 So. 2d 821
> (Ala. 1956); <u>Foster & Creighton Co. v. St. Paul Mercury
> Indem. Co.</u>, 88 So. 2d 825 (Ala. 1956); <u>see</u> <u>Knight v.
> Burns, Kirkley & Williams Constr. Co.</u>, 331 So. 2d 651
> (Ala. 1976).  In many cases, defendants have proven by
> competent evidence either that they had no control over
> the job site or that they had no control over the manner
> in which the work was performed.  In those cases, we have
> consistently refused to permit a finding of liability.

> See, e.g., Barron v. Construction One, 514 So.2d 1351
> (Ala.1987); Elder v. E. I. DuPont de Nemours & Co., 479
> So.2d 1243 (Ala.1985); Bacon v. Dixie Bronze Co., 475
> So.2d 1177 (Ala.1985); Beck v. Olin Co., 437 So.2d 1236
> (Ala.1983); Columbia Eng'g Int'l, Ltd., v. Espey, 429
> So.2d 955 (Ala.1983); Weeks v. Alabama Elec. Coop., Inc.,
> 419 So.2d 1381 (Ala.1982); Pate v. United States Steel
> Corp., 375 So.2d 459 (Ala.1979); and Chrysler Corp. v.
> Wells, 358 So.2d 426 (Ala.1978).  The justification for
> this exception is obvious: the parties charged with
> providing a safe workplace are the ones who either have
> assumed or have been delegated the duty to do so, or who
> are in such a position that the job site functions as
> they command.

Procter & Gamble Co. v. Staples, 551 So.2d 949, 953 (Ala. 1989);

see also Ramirez, 898 F.Supp at 1544 (citing this portion of

Procter with emphasis).  Under Procter and Ramirez, which was

affirmed by the Eleventh Circuit, the court's previous finding that

PPG did not retain or exercise control over the chilled water line

job precludes a finding of a duty under the inherently dangerous

exception.[14]  For these reasons, the court also rejects plaintiff's

contention that PPG had a non-delegable duty to provide plaintiff

with a safe working environment.[15]

---

[14]  Although the court has doubts whether plaintiff's tasks
were inherently dangerous in light of Alabama case precedent,
including Pope v. City of Talladega, 602 So. 2d 890, 893 (Ala.
1992), the court need not make this determination because there
is no issue of material fact with respect to control, which is an
element of this exception.  See Ramirez, 898 F.Supp. at 1544 n.5.

[15]  Even if the exception were applicable, the Eleventh
Circuit has interpreted Alabama law to mean that "even if there
is an exception to the rule for intrinsically or inherently
dangerous activities, the landowner can delegate that duty by
contract to the independent contractor."  Walden v. United States
Steel Corp., 759 F.2d 834, 837 (11th Cir. 1985) (referencing Beck
v. Olin Co., 437 So. 2d 1236, 1239 (Ala. 1983)).

23

*b.   Failure to Inform of Danger*

PPG cannot completely avoid liability by hiring Delta.  Delta was "on the premises at the express or implied invitation of [PPG] for a material or commercial benefit to [PPG]."  <u>Bates v. Peoples Sav. Life Ins. Co.</u>, 475 So. 2d 484, 485 (Ala. 1985).  Delta, an independent contractor, was PPG's business invitee.[16]  Employees of an independent contractor engaged in work in furtherance of the contract are also invitees.  <u>See</u> <u>Glenn</u>, 423 So. 2d at 154.  The duty associated with invitees requires the premises owner to warn of hidden dangers that are known to the owner but that are neither known to the contractor nor capable of being observed by the contractor in the course of ordinary care.  <u>General Motors</u>, 752 So. 2d at 1187; <u>Bacon</u>, 475 So. 2d at 1180.  In other words, the duty to keep the premises safe only applies to unknown dangers such as traps, snares, pitfalls, and the like.  <u>Ex parte Indus. Distrib. Serv. Warehouse, Inc.</u>, 709 So. 2d 16, 21 (Ala. 1997).  A premises owner is not responsible for injury from dangers that the independent contractor knows, or "ought to know of."  <u>Wallace v.</u>

---

[16]   The Alabama Supreme Court has uniformly applied the "business invitee" classification to independent contractors in personal injury and wrongful death claims against premises owners.  <u>See</u> <u>General Motors Corp. v. Hill</u>, 752 So. 2d 1186, 1187 (Ala. 1999); <u>Bacon v. Dixie Bronze Co.</u>, 475 So. 2d 1177, 1180 (Ala. 1985); <u>Hunter v. Gold Bond Bldg. Prod., Inc.</u>, 535 So. 2d 81, 82 (Ala. 1988); <u>Beck v. Olin Co.</u>, 437 So. 2d 1236, 1239 (Ala. 1983); <u>Glenn v. United States Steel Corp.</u>, 423 So. 2d 152, 154 (Ala. 1982).

Tri-State Motor Transit, Co., 741 F.2d 375, 376 (11th Cir. 1984) (citing Glenn, 423 So. 2d at 154).

It is also well-settled that a landowner is not liable for injuries resulting from open and obvious dangers on the premises. See Beck v. Olin Co., 437 So. 2d 1236, 1239 (Ala. 1983).  Thus, once plaintiff knew or should have known about the danger, "no further duty rest[s] on the landowner; that is, once [plaintiff] knew of the danger, [defendant's] duty was discharged even though, armed with that knowledge, [plaintiff] was still arguably subject to an unreasonable risk of harm."  Wallace, 741 F.2d at 377 (brackets supplied).  Even if the situation poses an unreasonable risk of harm to plaintiff, the owner has no duty to alter or reconstruct known and obvious dangers. See Quillen v. Quillen, 338 So. 2d 985, 989 (Ala. 1980).  Having found that plaintiff was PPG's invitee, the relevant question is whether the danger was open and obvious.

As a starting point, plaintiff would probably characterize the mid-ceiling as a pitfall mentioned above.  However, by its definition, a pitfall is "hidden or not easily recognized."  See WEBSTER'S DICTIONARY 887 (10th ed. 1996).  The area where plaintiff was working was dark.  "Total darkness, possibly concealing an unseen and unknown hazard, presents an open and obvious danger to someone proceeding through unfamiliar surroundings, as a matter of law."  Ex parte Indus. Distrib. Serv. Warehouse, Inc., 709 So. 2d

at 19 (affirming summary judgment for defendant because "a reasonable person would not walk the length of a large, windowless, and unlighted building and not realize that the way is dark."); see also Owens v. Nat'l Sec. of Alabama, Inc., 454 So. 2d 1387, 1389 (Ala. 1984) ("[w]hen someone proceeds through an unfamiliar facility in the dark, he has no right to assume that his course is clear."). Cf. Quillen v. Quillen, 388 So. 2d 985, 989 (Ala. 1980) (affirming directed verdict for defendant and holding that danger was open and obvious because plaintiff should have recognized it in the exercise of reasonable care).

A person using reasonable care should appreciate the danger of standing on a narrow board he could not see.  Even if the area had not been dark, the court has difficulty understanding how plaintiff could not have realized the danger.  Plaintiff was unfamiliar with the mid-ceiling area as he had spent only three or four hours there.  Simply because plaintiff was "uneducated" or working for a "ma and pa type company" (See Pl.'s Mot. Sum. J., at 42,) does not negate the reasonable care he was expected to exercise.  Likewise, the fact that plaintiff "didn't realize [falling] could have been that serious" or that he "never thought about having a safety harness" only shows plaintiff subjectively lacking in common sense, which in no way lessens what he objectively "ought to know."  This court finds that the danger was open and obvious to a reasonable person standing on a six inch wide board, fifteen feet above the

ground, in near darkness, in a relatively unfamiliar area, while trying to install piping.

    *c.   Failure to Supervise and Provide Equipment*

    Another effort to create liability on PPG is by alleging that PPG failed to supervise the Delta workers and provide them with safety equipment.   The essence of this allegation is that PPG should have controlled the plaintiff by inspecting the mid-ceiling area and making sure plaintiff was wearing safety gear.   Like plaintiff's other arguments, this contention is without merit.   PPG did not have an obligation to inspect or supervise how Delta's workers conducted their jobs.   If they had, PPG might well have exercised control.   The terms of the Purchase Order state that Delta was to provide "*all* labor, supervision, materials, equipment and tools" (emphasis supplied). <u>See</u> Def.'s Ex. 6.)   The fact that PPG had the right to enforce safety rules and exercised this right is not enough to create a duty because "on site monitor[ing] of contract compliance ... will not impose a legal duty of safety inspection upon the defendant." <u>Thomas</u>, 585 So. 2d at 885 (citing <u>Quillen v. Quillen</u>, 338 So. 2d 985, 989 (Ala. 1980)).

    Plaintiff argues by implication that even if defendant was not required to supervise, inspect and provide equipment to Delta workers, it voluntarily undertook to do so.   Under Alabama law, "one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care and is

liable for negligence in connection therewith." Dailey v. City of Birmingham, 378 So. 2d 728, 729 (Ala. 1979). "In cases where a voluntary undertaking has been found, either direct or indirect participation in the injury-causing hazard or inspection of the injury-causing instrumentality has been supported by evidence." Columbia Eng'g Int'l Ltd. v. Espey, 429 So. 2d 955, 966 (Ala. 1983). To support plaintiff's assertion, he offers (1) testimony that, on one occasion, a PPG employee told plaintiff to put on his safety goggles as he was exiting a bathroom and (2) the statement of Barry J. McGee from May 17, 2000 regarding health and safety:

> "[w]e are fully committed to the safety and health of all employees and will not compromise on what is necessary to do each job safely and in a healthful manner. We believe that all accidents and occupational illnesses are preventable. In pursuit of that belief, we will maintain a safe and healthy work environment and expect all employees to conform to all measures taken for their safety and health. ... With your personal commitment to improve safety and health within the Glass Technology Center and Aircraft Products – we can accomplish our ultimate goal of a work environment free of injury and illness."

The court finds the Columbia decision instructive on how to approach plaintiff's contention. See 429 So. 2d at 967. In that case, it was undisputed that the premises owner had the right to enforce safety violations. Id. Also, non-employees in the particle board plant had to adhere to safety rules promulgated by the premises owner. Id. The court found that the owner's interaction was limited to "ensuring proper adherence to the plans

28

and specifications" and "[o]ur cases require more than this" to find a voluntary undertaking. Id.

Likewise, this court finds that McGee's statement was not a promise or assurance to independent contractors because it was not communicated to them. The statement was made in an internal document issued to PPG employees. Moreover, the language resembles a general mission statement and, once again, the court will not impose liability on PPG for embracing the goal of having a safe and productive factory. Like the Columbia court, this court could not envision "a large project of this nature without such activity on behalf of the owner." Among the evidence showing PPG's limited involvement with Delta employees, examples of control or a voluntary undertaking of duties are noticeably absent. For these reasons, defendant is entitled to summary judgment in its favor on plaintiff's failure to supervise claim.

## V. CONCLUSION

In summary, the court finds that plaintiff has failed to come forward with evidence sufficient to establish a prima facie case for negligence or wantonness. More specifically, plaintiff did not establish an issue of material fact with respect to the existence of various duties alleged in the complaint. There is no dispute as to any material fact and the court concludes that defendant did not breach the duty imposed upon it by law to the limited extent that defendant owed plaintiff a duty as a business invitee. Similarly,

since the court has found that PPG has not engaged in any culpable conduct with respect to plaintiff, the court also finds plaintiff's claim for wanton misconduct without merit.  Because no material issue of fact remains and because defendant PPG is entitled to judgment as a matter of law, defendant's motion for summary judgment, as addressed to all the claims of plaintiff, is due to be granted.  A separate final order consistent with this memorandum of decision will be entered.

DONE this 19th day of January, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge